IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 109,121

In the Matter of the Marriage of JERI D. STEPHENSON,
*Appellee*,

and

GREGORY J. PAPINEAU,
*Appellant*.

SYLLABUS BY THE COURT

1.

The Kansas Supreme Court exercises unlimited review without deference to the district court or the Court of Appeals on issues decided on stipulated facts and the law that applies to those facts.

2.

A district court may—but does not necessarily have to—grant a credit to a child-support obligor who is current on child support when a lump-sum payment of accumulated social security disability insurance derivative benefits duplicates the obligor's support payment. A credit, if granted, may be used to offset other support obligations imposed by the court on the obligor. Alternatively, the district court might adjust an obligor's support obligations, require reimbursement of the duplicative payments from funds that are discrete from the social security benefits, or fashion some other equitable remedy permitted under applicable federal statutes and regulations.

Review of the judgment of the Court of Appeals in 49 Kan. App. 2d 457, 308 P.3d 1270 (2013). Appeal from Atchison District Court; ROBERT J. BEDNAR, judge. Opinion filed October 9, 2015.

1

Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and remanded with directions.

John W. Fresh, of Larry R. Mears, Chartered, of Atchison, argued the cause and was on the briefs for appellant.

J. David Farris, of J. David Farris Law Offices, of Atchison, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.: This appeal presents an issue of first impression: whether a child-support obligor, who became disabled and applied for social security disability insurance (SSDI) benefits for himself and his dependents, may be reimbursed or receive a credit for past child-support payments. The obligor in this case argues his children received duplicative payments, both of which satisfied his child-support obligations for the period between his application for and the approval of the SSDI derivative benefits: One payment came directly from the obligor as the child support became due and the second occurred when the Social Security Administration (SSA) paid the SSDI derivative benefits that had accumulated while his application was being processed. Both the district court and a divided Court of Appeals determined the disabled obligor was not entitled to a credit, a reimbursement, or an offset. *In re Marriage of Stephenson & Papineau*, 49 Kan. App. 2d 457, 308 P.3d 1270 (2013).

On review of the Court of Appeals decision, we reverse, holding that a district court may—but does not necessarily have to—grant a credit to a child-support obligor who is current on child support when a lump-sum payment of accumulated SSDI derivative benefits duplicates the obligor's support payment. A credit, if granted, may be

2

used to offset other support obligations imposed by the court on the obligor. Alternatively, the district court might adjust an obligor's support obligations, require reimbursement of the duplicative payments from funds that are discrete from SSDI benefits, or fashion some other equitable remedy permitted under applicable federal statutes and regulations. Because the district court in this case did not recognize the extent of its discretionary powers, we remand this case for further proceedings.

FACTS AND PROCEDURAL BACKGROUND

The district court resolved the issue in this appeal based on the following stipulated facts. Gregory J. Papineau and Jeri D. Stephenson divorced in 2006. Through the divorce decree, the district court granted Stephenson primary residential custody of their minor children and ordered Papineau to pay monthly child support. At the time relevant to this appeal, Papineau's monthly obligation was $782, and he did not owe an arrearage. The stipulated facts provided no additional information about the financial obligations of either party.

In 2010, Papineau became disabled. He began receiving long-term disability benefits through a policy with Standard Insurance Company, which allowed him to timely pay his monthly $782 child-support obligation. During this time Papineau also applied for SSDI benefits, but the SSA did not approve his application and begin providing those benefits until March 2012. These benefits included ongoing derivative payments of $802 per month to Stephenson as the "representative payee" of Papineau's dependent children. The SSA also made a $5,600 lump-sum payment to Stephenson for the children's benefit; this payment retroactively covered derivative benefits that had accrued during the time between Papineau's SSDI application and its approval.

3

Subsequently, Papineau filed a motion to modify his child-support obligation. He first asked the district court to relieve him of his personal obligation to make child-support payments, noting the monthly SSDI derivative payment to his dependent children fully and contemporaneously satisfied—and, in fact, exceeded—his monthly obligation. Second, he asked for an order requiring Stephenson to reimburse him for child support he had already paid in an amount equal to the lump-sum payment of accumulated SSDI derivative benefits. Papineau also asked the district court to consider the parties' stipulated fact that Standard Insurance Company was claiming "subrogation to all benefits received by [Papineau] and the minor children, to include the amount of the retroactive payment received by [Stephenson] on behalf of the minor children."

The district court granted Papineau's first request, recognizing that in *Andler v. Andler*, 217 Kan. 538, Syl. ¶ 4, 538 P.2d 649 (1975), this court held a child-support obligor may receive credit for SSDI payments made for the benefit of the obligor's minor children "to the extent of, but not exceeding" the obligor's monthly child-support obligation that is contemporaneous with the monthly SSDI payment. But the district court denied Papineau's second request for reimbursement of the child support he had paid during the pendency of his SSDI application. Citing *In re Marriage of Hohmann*, 47 Kan. App. 2d 117, 274 P.3d 27 (2012), *rev. denied* 297 Kan. 1245 (2013), the district court concluded Papineau's payments must be considered a gift that inures to the benefit of the children and may not be recovered.

Papineau appealed, and a divided Court of Appeals panel affirmed. *Stephenson & Papineau*, 49 Kan. App. 2d 457. Judge Gordon Atcheson dissented, concluding that Papineau should be allowed an "accommodation" in the form of a "payment or payments from Stephenson to Papineau, a credit against other obligations Papineau has under the divorce decree benefiting his sons, a combination of payments and credits, or something

4

else satisfactory to the parties and the district court." 49 Kan. App. 2d at 490 (Atcheson, J., dissenting).

Papineau filed a petition seeking review of the Court of Appeals decision, which we granted.

ANALYSIS

We begin our review in the same position as the district court and Court of Appeals—that is, we exercise unlimited review, without deference to the district court or the Court of Appeals, because the issue was determined based on stipulated facts and the law that applied to those facts. See *Rucker v. DeLay*, 295 Kan. 826, 830, 289 P.3d 1166 (2012). Papineau's appeal presents an issue of first impression, and we believe the best approach in this case is to follow the analytical path taken by the district court and Court of Appeals. Thus, we will analyze our decision in *Andler*, the Court of Appeals' decision in *Hohmann* and other cases, decisions from other jurisdictions, and statutes and regulations governing SSDI benefits.

As we do so, we will compare and contrast the Court of Appeals majority and dissenting opinions in the instant case. While valid arguments can be made for both sides of the issue and are well-stated in the Court of Appeals' split decision, upon our independent review of the authorities we conclude the dissenting opinion presents the more persuasive analysis and, with some modification, the appropriate outcome.

We begin our review with this court's decision in *Andler*.

5

1. Andler

In *Andler*, the parties divorced just months after an automobile accident resulted in a father's permanent disability. The district court ordered the father to pay child support to his former spouse, who was granted custody of the minor children. The court order did not mention the potential effect of SSDI benefits on the father's obligation. Yet, just 1 month after the decree was filed, the children began receiving SSDI benefits as their father's dependents; the SSDI payments exceeded the father's court-ordered obligation. After the monthly dependent benefits began, the father made four child-support payments from his own funds. He then stopped making personal payments, which led the mother to file a motion to have the father held in contempt for violation of the court's order. The mother argued, in part, that the father should not receive credit for the SSDI payments because the benefit came from an act of Congress, not the father.

The *Andler* court rejected the mother's argument. First, the court noted that SSDI benefits are not government gratuities. The *Andler* court reasoned: (1) SSDI benefits represent contributions a worker has made throughout the course of employment and the worker has a vested right in the payments, including derivative payments to dependent children, and (2) the underlying intent behind SSDI payments to a dependent child is to provide support that the disabled parent is unable to provide. Thus, in this sense, the benefits represent earnings in much the same way as would benefits paid by a private insurance company. *Andler*, 217 Kan. at 542-43; see 20 C.F.R. § 404.330 (2015) (indicating insured persons who suffer from a physical or mental disability and are no longer able to work are entitled to benefits from the SSA insurance program in the form of SSDI payments to themselves and their minor children); see also 42 U.S.C. § 415 (2012) (SSA benefit is directly related to the amount the insured has paid into the program).

6

Ultimately, the *Andler* court held that monthly SSDI benefits that derive from a child-support obligor's SSA benefits and are paid to the obligor's children satisfy ongoing child-support obligations because the source and purpose of the payments are the same—both child-support payments and SSDI benefits come from the income or assets of the obligor and provide for the needs of the minor children. 217 Kan. at 542-43; Kansas Child Support Guidelines § II.A. (2014 Kan. Ct. R. Annot. 127) (Guidelines) ("The purpose of child support is to provide for the needs of the child."); see *In re Marriage of Henry*, 156 Ill. 2d 541, 550-51, 622 N.E.2d 803 (1993) ("[T]he source and the purpose of social security dependent benefits are identical to the source and purpose of child support—both come from a noncustodial parent's wages or assets and both provide for the needs of the dependent child.").

*Andler*'s first holding thus supports Papineau's request to be relieved of personally making future monthly child-support payments, and neither party takes issue with this part of the district court's ruling. *Andler* also endorses Papineau's point that he "provided" both the child-support payments and the lump-sum payment of accumulated SSDI derivative benefits, which were benefits he earned by contributing social security taxes. See *Andler*, 217 Kan. at 542-43.

In its second holding, the *Andler* court held the father could not be credited with the amount by which the monthly SSDI benefit exceeded that month's child-support obligation. Even though the excess amount was "not a gratuity in the sense that it represents the children's vested right under the insurance concept of the Social Security system, it nevertheless is a gratuity under the divorce decree to the extent it exceeds the amount ordered in the divorce decree." 217 Kan. at 544. Consistent with this holding,

7

Papineau does not seek a credit for the amount by which the monthly SSDI benefit exceeds his court-ordered monthly child-support obligation each month.

Papineau does, however, seek reimbursement of the payments he made that essentially duplicate the payments covered by the retroactive SSDI payment of accumulated benefits. *Andler* is of some relevance because the disabled obligor in that case had also made duplicative payments—he had continued to personally pay child support for 4 months after the dependent SSDI monthly payments began. The *Andler* court briefly mentioned this issue, indicating the duplicative payments must be regarded as "gratuities" that did not prevent crediting the SSDI benefits toward the child support in those same months. 217 Kan. at 545.

In this appeal, the Court of Appeals majority interpreted this second *Andler* holding regarding gratuitous duplicative payments as standing for "the general rule that any excess Social Security disability payment beyond the minimum child support obligation is considered a gratuity that inures solely to the benefit of the child." *Stephenson & Papineau*, 49 Kan. App. 2d at 466. Consequently, the majority held Papineau had no right to a reimbursement or an offset. 49 Kan. App. 2d at 466.

Yet *Andler*, though relevant, presented a very different situation from this case. Harold Andler did not have an obligation to make an additional child-support payment each month beyond the SSDI payment because the SSDI payment fulfilled his obligation in the same month the child-support obligation became due. The SSDI payment satisfied the court's child support order, meaning Andler's personal child-support payments were duplicative at the time he made them—and thus these additional child-support payments were truly gratuitous. See Black's Law Dictionary 816 (10th ed. 2014) (defining "gratuitous" as "1. Done or performed without obligation to do so; given without

8

consideration in circumstances that do not otherwise impose a duty . . . . 2. Done unnecessarily.").

In contrast, Papineau had a court-ordered obligation to make the payments for which he seeks reimbursement; it is the retroactive application of SSDI payments that made them duplicative. If he had not made the payments while his SSDI application was being processed, his children would not have received any support and he would potentially have been in contempt of court. Court-ordered payments do not equate with the commonly understood definition of "gratuity"—they result from a legally imposed obligation. This difference in circumstances creates a significant distinction between this case and that portion of the *Andler* decision regarding duplicative payments.

Significantly, neither *Andler* nor any other decision of this court directly or indirectly answers the question raised in this appeal or, more generally, discusses the effect of a lump-sum payment of accumulated SSDI derivative benefits on an obligor's child-support obligation. Several Court of Appeals decisions have addressed these issues, however, and, while these opinions do not bind us they may be considered as persuasive authority. See *State v. Quested*, 302 Kan. ___, 352 P.3d 553, 558-59, (2015). We, therefore, next examine those opinions.

2. *Previous Court of Appeals Opinions*

In the earliest Court of Appeals decision considered by the panel below in this case, *In re Marriage of Williams*, 21 Kan. App. 2d 453, 900 P.2d 860 (1995), a father sought to apply the amount by which the monthly SSDI derivative payment to his children exceeded his monthly court-ordered obligation—*i.e.*, the excess the *Andler* court had labeled a "gratuity"—to his child-support arrearages. Citing *Andler*, the Court of

9

Appeals reasoned that the excess monthly benefit, a "windfall," should inure to the benefit of the children, not the father, and it refused to reduce the arrearage by the amount of the excess. 21 Kan. App. 2d at 454-56. This holding reinforced *Andler*'s restriction of any credit for SSDI benefits to the specific month the benefit covered. Papineau seeks a credit that is consistent with this holding and the corresponding holding in *Andler*.

The restriction correlating a monthly child-support obligation with the benefit for the same month was emphasized again in the next case considered by the Court of Appeals, *Hohmann*, 47 Kan. App. 2d 117. In that appeal, a different Court of Appeals panel considered whether a retroactive lump-sum payment of accumulated SSDI derivative benefits paid to the nonobligor, as a representative payee for the dependent children, could be applied to a child-support arrearage. Broadly noting that a majority of other states allowed a credit against an arrearage for a lump-sum benefit, the *Hohmann* panel held a disabled father "may" receive a credit toward any "child support arrearage that accumulated during the months covered by the lump-sum payment." 47 Kan. App. 2d at 121. However, "[i]f the payment is in excess of the arrearage [accumulated during the months covered by the lump-sum payment], the excess benefit accrues to the child as a gift and may not be credited to any arrearage that accumulated prior to the months covered by the lump-sum payment." 47 Kan. App. 2d at 121. The *Hohmann* court thus affirmed the district court's decision to credit the SSDI lump-sum payment of accumulated benefits against the obligor's past due support. *Hohmann*, 47 Kan. App. 2d at 121. But the *Hohmann* panel did not elaborate on whether its holding that the accumulated benefits "may" be credited meant a district court had discretion to either allow or deny the credit.

Then, in *In re Marriage of Taber*, 47 Kan. App. 2d 841, 280 P.3d 234 (2012), *rev. denied* 298 Kan. 1202 (2013), a Court of Appeals panel was asked to reexamine the

holdings in *Hohmann*. The *Taber* panel consisted of the same judge who authored *Hohmann* (and who ultimately authored *Taber*) and two other judges who had not decided *Hohmann*. As in *Hohmann*, a disabled obligor failed to pay his monthly child-support obligation while his application for SSDI benefits was being processed. When benefits were approved, the obligor sought a credit against the arrearage in the amount of the lump-sum accumulated payment made for the benefit of his children.

The *Taber* panel reaffirmed the holding in *Hohmann*, again stating that the lump-sum payment of accumulated derivative benefits "may be credited toward Father's child support arrearage that accumulated during the months covered by the lump-sum payments." 47 Kan. App. 2d 841, Syl. ¶ 1. But without discussion as to whether "may" meant the district court had discretion to award or deny the credit, the panel reversed the district court's ruling that no credit should be given, remanded the case, and directed the district court to give a credit toward the obligor's "child support arrearages for those months in an amount equal to the amount of [the dependent child's] SSDI payment in each specific month." 47 Kan. App. 2d at 846. Tellingly, the panel did not remand for the district court to consider all the circumstances and exercise its discretion to determine whether a credit should be allowed. It seems the panel intended its statement that the amount "may" be credited to mean it "must" be credited, an interpretation that has implications for the way the Court of Appeals majority viewed Papineau's claim.

*Hohmann* and *Taber* each addressed at least one of the two contentions at play in the instant appeal. We next consider each in turn.

11

2.a. *Gratuity or Not*

First, the *Hohmann* panel briefly addressed the argument that a "logical extension" of crediting a lump-sum SSDI payment against child-support arrears would be a requirement that the nonobligor repay any timely-made child support obligations that were later duplicated by a lump-sum SSDI derivative benefit. The *Hohmann* panel correctly pointed out that question was not at issue in its case. Nevertheless, it also "note[d] that the majority of courts who have decided this issue have found that the nonobligor parent is not required to return such 'overpayments' to the obligor parent. Most courts view it as a voluntary overpayment that inures solely to the benefit of the child." 47 Kan. App. 2d at 121 (citing *Child Support Enforcement Agency v. Doe*, 92 Hawai'i 276, 285-86, 990 P.2d 1158 [Hawai'i App. 1999]; *Brown v. Brown*, 849 N.E.2d 610, 616 [Ind. 2006]; *Newman v. Newman*, 451 N.W.2d 843, 844 [Iowa 1990]; *Holmberg v. Holmberg*, 578 N.W.2d 817, 827 [Minn. App. 1998], *aff'd* 588 N.W.2d 720 [Minn. 1999]; *Keith v. Purvis*, 982 So. 2d 1033, 1038-39 [Miss. App. 2008]; *Steel v. Hartwick*, 209 W. Va. 706, 708-09, 551 S.E.2d 42 [2001]).

The *Taber* panel, in discussing the same question, cited the same out-of-state cases and then added: "Our Supreme Court has addressed this issue in *Andler*." 47 Kan. App. 2d at 846.

But, in relying on *Andler*, the *Taber* panel failed to discuss the distinction we have already made between the situation in *Andler* (where the contemporaneous SSDI benefits fulfilled the child support obligation and the disabled parent had no additional obligation to make a payment) and a situation such as Papineau's (where he had a court-ordered duty to make a timely monthly payment before SSDI benefits began). This distinction is

important because, in Papineau's case, there was a point in time when there would be no child-support payment if he failed to pay, there was no guarantee his SSDI application would be granted, and there remained a possibility that dependent benefits, including the lump-sum accumulation, would not be approved or paid. By failing to recognize this distinction, the *Taber* panel did not merely apply *Andler* but instead expanded its scope.

Nevertheless, as both panels noted, there is some out-of-state support for treating the payment as a gratuity. In general, we do not find this caselaw persuasive under the circumstances of this case, where Papineau's child-support payments were obligatory at the time they were made. Some courts avoid any problem posed by the obligatory nature of the child-support payments by reasoning that they are gratuitous because the obligor failed to seek a modification of the court order. *E.g.*, *Brown*, 849 N.E.2d at 615 (endorsing the requirement that an obligor petition for modification and also alert the court to a pending application for benefits, following which the court could defer its ruling on the petition); *Newman*, 451 N.W.2d at 845 (similar). The Court of Appeals majority in this case similarly relied on what it deemed to be Papineau's failure to seek a modification of his child-support obligations when he became disabled. See *In re Marriage of Stephenson & Papineau*, 49 Kan. App. 2d 457, 466, 308 P.3d 1270 (2013).

Regardless of the approach in other states, the majority's holding in *Stephenson* creates an inequity in Kansas between obligors who meet their child-support obligations while awaiting an SSA determination and those who do not: the Court of Appeals allowed the nonpaying obligors in *Hohmann* and *Taber* to credit their arrearages without limiting the credit to payments that became due after a motion to modify had been filed. Yet in this case the Court of Appeals majority would impose those requirements on the obligor who makes payments.

13

In addition to noting this inconsistent treatment, we observe that the Court of Appeals majority's factual premise that Papineau did not file a motion to modify when he became disabled or applied for SSDI benefits draws a conclusion not supported by the stipulated facts, which do not mention whether a motion had been filed.

Moreover, as Papineau argues, a motion filed at that time would likely have been dismissed because he would have been unable to sustain his burden of showing a material change in circumstances as necessary to pursue a modification of support. See Guidelines § V.A. (2014 Kan. Ct. R. Annot. 147) ("Courts have continuing jurisdiction to modify child-support orders to advance the welfare of the child when there is a material change of circumstances."). Under Kansas' Guidelines, "[i]n addition to changes of circumstance which have traditionally been considered by courts," the Guidelines specify other situations that constitute a material change of circumstances. Guidelines S.V.B. (2014 Kan. Ct. R. Annot. 147-48). These exceptions do not apply under the facts of this case, as least as set out in the stipulated facts. The broadest provision applies to a "[c]hange of financial circumstances of the parents or the guidelines" but only if the changed circumstances result in a 10% change in the child-support obligation indicated by the Guidelines. Guidelines § V.B.1. (2014 Kan. Ct. R. Annot. 148); see also Guidelines § V.B.3. (defining material change as child having passed his or her 6th or 12th birthday, which places child in a higher age group in the guidelines); Guidelines § V.B.4. (defining material change as child becoming emancipated under a court order).

Here, Papineau experienced a drastic change of circumstances when he became disabled and not able to work, but his private disability insurance essentially replaced his wages, maintaining his income at or near the level it had been when the child-support order had been entered and providing him with the resources to pay his child-support obligation. See Guidelines § II.D. (2014 Kan. Ct. R. Annot. 128) ("The Domestic Gross

14

Income for the wage earner is income from all sources."). Hence, nothing in the stipulated facts suggests a *material* change in circumstances that would result in a 10% change in the child support obligation. See 67A C.J.S., Parent and Child § 247 (generally discussing other court-recognized factors that may constitute a material change of circumstances, which generally encompass a change in the needs of the child, a change in the parent's financial ability to provide for those needs, or a change in expenses).

In sum, even if Papineau failed to file a motion to modify his support obligation at the time he became disabled, that failure does not justify treating his court-ordered child-support obligation as a gratuity.

### 2.b. *Creating a Disincentive*

This brings us to an argument raised by Papineau that was addressed by the *Taber* panel. Specifically, Papineau argues that crediting lump-sum SSDI benefits against support arrearages creates a disincentive for an SSDI applicant to timely pay child support. While not explicitly recognizing a "disincentive," the *Taber* panel seemed to implicitly acknowledge its existence but dismissed its import because of the overriding obligation to comply with a court order, noting that the failure to make the payments can result in contempt proceedings, "income withholding orders[, and] threats of incarceration . . . . [A]ny failure to pay child support is at the obligor parent's own risk and subjects him or her to the court's broad powers to punish for contempt." *Taber*, 47 Kan. App. 2d at 843.

Other courts have been more troubled by a rule where, practically speaking, an obligor has a disincentive to pay child support while awaiting an SSA decision on his or her SSDI benefits. For example, in *Paulhe v. Riley*, 295 Wis. 2d 541, 553, 722 N.W.2d

155 (Wis. App. 2006), the Wisconsin Court of Appeals considered the impact of a state statute that allowed a court to credit lump-sum payments of accumulated SSDI derivative benefits against a child-support arrearage. The obligor in *Paulhe* had made timely support payments and owed no arrearage but sought the same treatment—a credit—as the statute afforded to an obligor with an arrearage. The nonobligor argued the credit could not be allowed because the legislature had limited the availability of a credit to situations where an arrearage existed. The Wisconsin Court of Appeals rejected the nonobligor's argument.

First, the Wisconsin court recognized the reality that allowing a credit only if there was an arrearage created an economic incentive to allow an arrearage to accumulate. This meant that interpreting the statute to exclude other circumstances would be "clearly contrary to the public policy underpinning child support," which is to encourage timely support payments. 295 Wis. 2d at 553.

In addition, the *Paulhe* court explained, such an interpretation would create a disparity. Specifically, if an obligor who does not pay child support while awaiting approval of his or her SSDI application is allowed a credit against an arrearage, the obligor's children eventually benefit from only the lump-sum accumulated benefit and the obligor pays nothing out of pocket. In contrast, if an obligor who makes timely payments is not allowed any accommodation for the lump-sum payment, the obligor's children receive both the SSDI lump sum and the child support and the obligor is worse off than the parent who did not meet his or her court-ordered obligation. Given this "incongruity," the Wisconsin court concluded an equal protection violation would arise if the statute was interpreted to prohibit a credit when no arrearage had accumulated: "In its simplest terms, equal protection requires that those who are similarly situated must be similarly treated." 295 Wis. 2d at 553-54.

16

Papineau does not make an equal protection argument. But he does assert that the Court of Appeals has created inconsistency in the treatment of disabled obligors because, under its interpretation, *Hohmann* and *Taber* would allow the delinquent obligor a credit but not allow a credit to those obligors who timely fulfilled their court-ordered obligations. He argues we should adopt a more equitable approach and one that does not create a disincentive to timely pay.

### 3. Papineau *Court of Appeals' Treatment of These Issues*

Judge Atcheson essentially agreed with Papineau's arguments on this point, concluding that treating the duplicative payments as an unrecoverable gratuity resulted in a disincentive to make timely payments. *Stephenson & Papineau*, 49 Kan. App. 2d at 472-73, 481 (Atcheson, J., dissenting). In addition, he observed that the majority's holding treated Papineau's children (who effectively received the benefit of two payments) more favorably than the children who only received one payment in *Taber*, 47 Kan. App. 2d 841, and *In re Marriage of Hohmann*, 47 Kan. App. 2d 117, 274 P.3d 27 (2012), *rev. denied* 297 Kan. 1245 (2013), and penalized Papineau (who made out-of-pocket payments) as compared to the obligors in *Hohmann* and *Taber* (who did not make out-of-pocket payments). Judge Atcheson argued this disparate treatment is inconsistent with *Andler v. Andler*, 217 Kan. 538, 538 P.2d 649 (1975), *Taber*, and *Hohmann* because "[t]he logical extension of those cases would apply the same rule and reach the same outcome:  The children should receive the greater of the disability benefits or the child support payments for the 7 months Papineau's application lingered with the Social Security Administration awaiting a determination." *Stephenson & Papineau*, 49 Kan. App. 2d at 472 (Atcheson, J., dissenting). Judge Atcheson suggested that "[s]uch a

17

pronounced inconsistency ought to require a compelling rationale. Here . . . no such justification turns up." 49 Kan. App. 2d at 473 (Atcheson, J., dissenting).

Judge Atcheson makes several valid points. Certainly the Court of Appeals approach creates a disincentive to timely pay support. This disincentive should not and does not excuse an obligor from his or her legal and moral obligations to pay child support. Nevertheless, since the fundamental purpose of child support is to timely provide for the ongoing needs of a child, the law should not discourage an obligor from making continuous and timely payments. Guidelines § II.A. (2014 Kan. Ct. R. Annot. 127); see *In re Marriage of Williams*, 21 Kan. App. 2d 453, 456, 900 P.2d 860 (1995) ("[T]he legislature has established the policy of recognizing the importance of timely monthly support payments."). And the combination of Court of Appeals decisions results in disparate treatment of obligors who receive lump-sum SSDI awards and of their dependents. Consequently, we agree with Judge Atcheson's assessment that there should be a compelling justification for the position.

For its part, the Court of Appeals majority acknowledged Papineau's disincentive argument but turned to the dicta in *Taber* and *Hohmann* regarding the hypothetical argument about repayment of the duplicative support as "persuasive authority for the proposition that an obligor parent is not entitled to reimbursement for timely child support payments made during months for which the minor children ultimately receive a retroactive lump-sum payment of the obligor parent's Social Security disability benefits." *Stephenson & Papineau*, 49 Kan. App. 2d at 463. The Court of Appeals majority also: (1) cited Papineau's failure to file a motion for modification when he became disabled or when he applied for SSDI benefits; (2) relied on authority from other states for treating duplicative payments as a gratuity that inures solely to the benefit of the children; and (3) criticized Papineau's position because it essentially requires viewing "his child

18

support obligation as something akin to an account ledger that can and should be reconciled at the end of the fiscal term." 49 Kan. App. 2d at 466. The Court of Appeals argued the situation should be viewed as if Papineau and Stephenson remained married, in which case the family "would have done its best to use its resources, including the disability benefits paid by Standard, to meet the children's needs. In that situation, Papineau would not be entitled to reimbursement." 49 Kan. App. 2d at 466.

We next examine these three points.

### 4. *The Court of Appeals Majority's Rationale*

#### 4.a. *Failure to File a Motion to Modify*

We have already discussed the first of these points—Papineau's failure to file a motion to modify as soon as he applied for disability benefits. As we have pointed out, this point is not persuasive as it adds to the inequitable treatment of different obligors and in Papineau's situation would not, arguably, have been appropriate under our Child Support Guidelines.

#### 4.b. *Other Decisions Relied Upon by* Papineau *Majority*

Like Kansas, a majority of jurisdictions allow SSDI payments made to dependent children to be credited against child-support obligations. See Annot., 34 A.L.R.5th 447, II.A. But courts in these jurisdictions deal with the practical application of that rule in various ways, and there are very few decisions touching on the specific problem of how to treat lump-sum accumulated benefits when there is no arrearage in child-support payments—in other words, where there are obligors, like Papineau, who have kept up

with child-support payments while awaiting an SSDI benefits decision. From those few decisions, the majority found support in the Mississippi Court of Appeals decision in *Keith*, 982 So. 2d 1033, and the West Virginia Supreme Court decision in *Steel*, 209 W. Va. 706. While generally supporting the majority position, distinctions in Mississippi and West Virginia law undercut the majority's reliance on these cases.

In *Keith*, like here, an obligor was not in arrears when his daughter received a lump-sum payment of accumulated SSDI benefits followed by prospective monthly SSDI benefits. The Mississippi court held the father was not entitled to be reimbursed for the support he paid while his SSDI application was processed. *Keith*, 982 So. 2d at 1038-39. While that holding supports the Court of Appeals' view, a critical point distinguishes Mississippi and Kansas law: In Mississippi, an obligor parent is only entitled to credit SSDI payments against child-support obligations "for the period in which [the child] actually received [or receives]" the payments, "*commencing with . . . receipt of the lump sum payment*." (Emphasis added.) 982 So. 2d at 1038. In other words, unlike a Kansas obligor benefitting from *Taber* and *Hohmann*, a Mississippi obligor cannot receive a credit even against arrears accumulated during the period covered by the lump-sum SSDI payment. See *Chapman v. Ward*, 3 So. 3d 790, 795-96 (Miss. App. 2008) ("Precedent does not allow the noncustodial parent to receive credit for arrearages, only credit for the current support due."); see also *In re Marriage of Taber*, 47 Kan. App. 2d 841, 846, 280 P.3d 234 (2012), *rev. denied* 298 Kan. at 202 (2013); *Hohmann*, 47 Kan. App. 2d at 121.

Papineau's argument, which echoes the arguments considered in *Taber* about a disincentive to make timely payments, underscores the significance of this distinction. The Mississippi court did not create a disincentive to timely pay because Mississippi law does not provide any incentive for an obligor parent not to pay; even if a lump-sum SSDI accumulated-benefit payment is received, consistently paying child support is the only

20

way to satisfy child-support obligations in Mississippi. While consistency could be achieved through a similar rule in Kansas, that rule would be contrary to *Taber*'s and *Hohmann*'s allowance of a credit against an arrearage in the amount of the SSDI lump-sum payment accruing in the months during which the SSDI benefit accumulated.

In *Steel*, the second case relied upon by the Court of Appeals majority, an obligor remained current on his child-support obligations while his Social Security disability claim was pending and then sought reimbursement. In denying his request, the West Virginia Supreme Court looked to a prior case, *Farley v. Farley*, 186 W. Va. 263, 412 S.E.2d 261 (1991), which held that a district court could credit a lump-sum SSDI payment made on behalf of a dependent child against arrears if

"(1) the debtor spouse has acted in good faith and has promptly sought court approval of the credit of social security against child support; (2) in the discretion of the trial court, there were no other assets reasonably available from which child support payments could have been paid; and (3) there were no other changes in circumstances that, in their totality, militate against awarding credit." 186 W. Va. at 267.

Because these factors mean that awarding a credit against an arrearage is discretionary, the *Steel* court did not view *Farley* as mandating reimbursement when there were no arrears against which to credit a lump sum and saw no reason, in the exercise of discretion, to order reimbursement under the facts before it. *Steel*, 209 W. Va. at 708-09.

West Virginia is not alone in its discretionary approach to the treatment of SSDI benefits. See, *e.g.*, *Matter of Estate of Patterson*, 167 Ariz. 168, 172-74, 805 P.2d 401 (Ariz. App. 1991) (recognizing that equitable principles may entitle an obligor to credit disability payments against child-support obligations); *Fowler v. Fowler*, 156 Conn. 569, 574, 244 A.2d 375 (1968) (holding SSDI payments can be credited against arrearage, but

21

district court did not abuse its discretion in denying credit under the facts of the case); *Dept. of Public Aid ex rel. McNichols v. McNichols*, 243 Ill. App. 3d 119, 122-23, 611 N.E.2d 593 (1993) ("The decision to grant or deny respondent's request [for a setoff of social security benefits against a child-support arrearage] lies within the sound discretion of the trial judge."); *Drummond v. State to Use of Drummond*, 350 Md. 502, 505, 521-22, 714 A.2d 163 (Md. App. 1998) (credit of SSDI payments towards child-support obligation is not automatic, district court did not abuse its discretion in denying credit); *Johnson v. Johnson*, 290 Neb. 838, 853, 862 N.W.2d 740 (2015) (under equities of the case the district court did not err in declining to credit SSDI payments against child-support obligations); *In re State and Estate of Crabtree*, 155 N.H. 565, 572, 926 A.2d 825 (2007) ("the trial court has the discretion to allow credit toward a child support arrearage based upon dependency benefits received by the obligor's children"); *Com., Dept. of Social Servs., Div. of Child Support Enforcement v. Skeens*, 18 Va. App. 154, 156, 442 S.E.2d 432 (1994) ("whether the trial court credits the payment against an arrearage for court-ordered support depends upon the circumstances of each case and rests in the sound discretion of the trial judge"). Still other courts recognize a rebuttable presumption that SSDI payments will be credited against child-support obligations. See, *e.g.*, *Mackalica v. Mackalica*, 716 A.2d 653, 656-57 (Pa. Super. 1998).

The *Hohmann* and *Taber* panels did not discuss the role, if any, of a district court's discretion to weigh the equities of granting an obligor a credit if the obligor lacked the ability to timely pay child support but not granting the credit if the obligor had the ability to pay support but decided not to make the payments so that he or she could take economic advantage of the credit against the arrearage when the lump-sum payment was received. While the question of a credit in light of an arrearage is not before us, we nevertheless note that those courts recognizing a judge's discretion to apply a lump-sum payment to a child-support arrearage do not create the disincentive to not timely pay; in

fact, equity would suggest that the obligor who has made a diligent effort to pay as much as possible toward the obligation (and who stands before the court with what equity recognizes as clean hands) is likely to receive the more favorable treatment—*i.e.*, a credit. In other words, Mississippi, through *Keith v. Purvis*, 982 So. 2d 1033 (Miss. App. 2008)—where no credit is received regardless of whether the obligor's hands are clean—and West Virginia, through *Steel v. Hartwick*, 209 W. Va. 706, 551 S.E.2d 42 (2001)—where a court could consider whether the obligor's hands were clean or unclean—created a consistent approach to the handling of lump-sum payments.

In contrast, equity plays no role under the Court of Appeals decisions. Given *Taber*'s implicit holding that a district court judge must allow a credit against an arrearage, a Kansas obligor receives a credit even if he or she had the ability to make the child-support payments and therefore stands before the court with unclean hands. Yet, under the Court of Appeals majority's holding in this case, an obligor who complies with a court order and has clean hands does not receive a credit. We find it hard to equitably justify this inconsistency.

Because of these distinctions, we do not find the Court of Appeals majority's reliance on these authorities to be persuasive or to justify creating a disincentive or disparate treatment.

### 4.c. *Majority's Rejection of an Accounting Approach*

The Court of Appeals majority was also critical of an approach that solely focused on the treatment of the child-support obligor. As the majority aptly noted, a parent's moral and legal obligation to support his or her children should not be viewed "as something akin to an account ledger that can and should be reconciled at the end of the

fiscal term." *In re Marriage of Stephenson & Papineau*, 49 Kan. App. 2d 457, 466, 308 P.3d 1270 (2013). Indeed, the focus is on the best interests of the children and meeting their needs. See Guidelines § I. (2014 Kan. Ct. R. Annot. 127) (district court can make adjustments to the child-support calculations if relevant evidence establishes "it is in the best interest of the child."); Guidelines § IV.E.6. (2014 Kan. Ct. R. Annot. 145) ("The financial situation of the parties may be reason to deviate from the calculated Basic Parental Child Support Obligation if the deviation is in the best interest of the child. . . . One example might be if either party has more than one job, the circumstances requiring the additional employment should be considered.").

But the Guidelines are also designed to fairly and equitably balance the financial burden of both parents by examining their relative incomes and obligations and looking at the financial picture of the entire family. Certainly, creating a disincentive to pay child support in a timely fashion does not accomplish that goal. A disincentive may result in an obligor not making timely payments, which could unfairly and unduly burden the nonobligor.

Furthermore, as previously noted, the Court of Appeals decisions in this case, *Taber*, and *Hohmann*, when construed together, create inequities in the treatment of obligors and in the benefits received by dependent children. These inequities may become exacerbated if Papineau must reimburse Standard Insurance Company, which according to the parties' stipulated facts is seeking subrogation of all retroactive benefits received from the Social Security Administration, including the amount received by his minor children. While Papineau asks us to determine the merits of this subrogation claim, he concedes that Standard is not a party in this action. And all three judges on the Court of Appeals panel in this case agreed that the record was not adequate for a reviewing

24

court to consider this issue. *Stephenson & Papineau*, 49 Kan. App. 2d at 467, 477 n.1. We reach the same conclusion.

Nevertheless, the possibility that Papineau might have to repay the portion of his disability insurance payments from Standard that duplicate the lump-sum payment of accumulated SSDI benefits, including the benefits paid to Stephenson as the representative payee for the dependent children's lump-sum accumulated benefit, points out the type of issue that might cause economic instability to the family as a whole. The abbreviated facts presented on appeal do not provide us with the information necessary to consider the potential ramifications. By way of example, however, if Papineau becomes obligated to reimburse Standard for the lump-sum dependent benefits, he might not have the ability to pay future obligations he might owe under the court's order—such as payment of uninsured medical or dental expenses of the children. The all-or-nothing approach adopted by the Court of Appeals in *Taber* (allowing all reimbursement in the case of an arrearage) and the nothing approach adopted by the majority in this case (no credit if no arrearage) leaves no room for considering such matters or the family's entire financial situation.

Papineau's cure for this inequity would be to allow him to be reimbursed in the amount of the lump-sum payment of accumulated SSDI derivative benefits—to, in effect, be put in the same position as the obligors in *Taber* and *Hohmann*. But there are difficulties with this position as well, including constraints imposed by federal statute.

5. *Caselaw Regarding Repayment and 42 U.S.C. § 407(a) (2012)*

As noted in *Taber* and *Hohmann*, most courts have stopped short of ordering a nonobligor to remit any overpayments that result from a lump-sum payment. *Taber*, 47

25

Kan. App. 2d at 846; *Hohmann*, 47 Kan. App. 2d at 121. These courts typically take one of two views. As we have already discussed, some conclude that any excess payment will equitably be deemed to be a gratuity to the child so the custodial parent is not obligated to refund to the obligor any overpayment. See, *e.g.*, *Child Support Enforcement Agency v. Doe*, 92 Hawai'i 276, 285-86, 990 P.2d 1158 (Haw. App. 1999); *Brown v. Brown*, 849 N.E.2d 610, 616 (Ind. 2006); *Newman v. Newman*, 451 N.W.2d 843, 844 (Iowa 1990); *Holmberg v. Holmberg*, 578 N.W.2d 817, 827 (Minn. App. 1998), *aff'd* 588 N.W.2d 720 (Minn. 1999). But as we previously noted, to deem a court-ordered payment a "gratuity" seems inconsistent with the common definition of the word.

Other courts, such as the Mississippi Court of Appeals in *Keith*, 982 So. 2d 1033, and the West Virginia Supreme Court in *Steel*, 209 W. Va. 706, take the view that the obligor parent is not entitled to reimbursement of any excess child support because the funds belong to the child, not to the noncustodial parent, and the child has committed no inequitable conduct nor been unjustly enriched. This position finds support in federal statutes and regulations, which some courts interpret as prohibiting the direct reimbursement of SSDI moneys.

Under these statutes and regulations, derivative benefits for dependent children of disabled individuals entitled to SSDI payments may be made to a representative payee who has a fiduciary duty to use the funds "in a manner and for the purposes he or she determines" benefit the child and are consistent with the child's best interests. 20 C.F.R. § 404.2035(a) (2015); see 42 U.S.C. § 402(d)(1) (2012). The SSA considers funds to have been used for the benefit of the child if they are applied toward the child's "[c]urrent maintenance," which "includes cost incurred in obtaining food, shelter, clothing, medical care, and personal comfort items." 20 C.F.R. § 404.2040(a) (2015). Any amount remaining after proper expenditures must be conserved or invested on behalf of the child.

20 C.F.R. § 404.2045(a) (2015). The SSA protects against noncompliance by requiring a representative payee to keep records of the use of the funds and to submit a written report at least once a year. 42 U.S.C. § 405(j)(3)(A) (2012); 20 C.F.R. § 404.2065 (2015). Further, "[a] representative payee who misuses benefits is responsible for paying back misused benefits." 20 C.F.R. § 404.2041(a) (2015). As a package, these provisions severely limit the ability to redirect the use of the derivative benefit to reimburse a child-support obligor.

In addition, 42 U.S.C. § 407(a) (2012) provides, in part, that "none of the moneys paid . . . under this subchapter shall be subject to execution, levy, attachment, garnishment *or other legal process*." (Emphasis added). In *Philpott v. Essex County Welfare Bd.*, 409 U.S. 413, 417, 93 S. Ct. 590, 34 L. Ed. 2d 608 (1973), the United States Supreme Court held that 42 U.S.C. § 407 "imposes a broad bar against the use of any legal process to reach all social security benefits."

In this case, Judge Atcheson in his dissent mentions 42 U.S.C. § 407(a) but dismisses it as inapplicable because "Papineau is not a creditor looking to seize the disability benefits to satisfy some existing debt for goods and services, thereby depriving the children of essential financial resources." *Stephenson & Papineau*, 49 Kan. App. 2d at 487 (Atcheson, J., dissenting). As such, Judge Atcheson listed as a possible "accommodation" to Papineau the possibility of a "payment or payments from Stephenson to Papineau." 49 Kan. App. 2d at 490 (Atcheson, J., dissenting).

Other courts have not been as dismissive of the statute's effect, concluding that regardless of whether a child-support obligor is a typical creditor, the plain language of the statute prevents SSDI moneys from being subject to any "other legal process," and a modification proceeding seeking reimbursement of SSDI moneys is a legal process,

27

rendering 42 U.S.C. § 407(a) applicable and direct reimbursement unavailable. See, *e.g.*, *Brevard v. Brevard*, 74 N.C. App. 484, 487-88, 328 S.E.2d 789 (1985); *LaMothe v. LeBlanc*, 193 Vt. 399, 409, 70 A.3d 977 (2013); *Steel*, 209 W. Va. at 709-10. More generally, several courts have held that the doctrine of federal preemption precludes state courts from exercising jurisdiction to direct a representative payee's disposition of derivative social security funds. *E.g.*, *C.G.A. v. State*, 824 P.2d 1364, 1367 (Alaska 1992); *In re Guardianship of Smith*, 2011 ME 51, ¶¶ 13-14, 17 A.3d 136; see *LaMothe*, 193 Vt. at 426-27 (Dooley, J., concurring in part and dissenting in part) (discussing cases). But see *Hamilton v. Reynolds*, 5 N.E.3d 1053, 1061 (Ohio App. 2013) (without discussing § 407, court orders nonobligor to reimburse duplicative child support at rate of $500 per month); *Orr v. Orr*, 871 S.W.2d 695 (Tenn. 1993) (not discussing § 407 and permitting, with little explanation, credit for a lump-sum payment of SSDI benefits); *Rathbone v. Corse*, 2015 VT 73, ¶ 19, __ A.3d. __ (2015) (not discussing § 407 but holding that "[a]llowing reimbursement for payments during the pendency of an application would encourage obligor parents to continue support payments as they await the outcome of their SSDI applications").

Despite the fact that those courts that consider the effect of § 407 seem to agree that a court cannot order a nonobligor parent to turn over a lump-sum SSDI accrued-benefit payment to an obligor or to redirect monthly SSDI benefits, several have still ordered relief to an obligor whose timely child-support payments were duplicated by a lump-sum SSDI accumulated derivative benefit. The relief granted and the rationale for doing so have varied.

In *Davis v. Davis*, 2010 ND 67, ¶ 16, 780 N.W.2d 707, the North Dakota Supreme Court concluded § 407 did not preclude it from enforcing a state regulation that allowed an obligor to receive a credit toward the obligor's child support obligation for any

28

derivative social security benefits. The court reasoned that "[a]ny difficulty [the obligor] may have in enforcing the judgment provides no basis for denying him a judgment mandated under the law." 2010 ND 67, ¶ 16.

Other courts have construed 42 U.S.C. § 659(b), which excepts from the reach of § 407 a "notice to withhold income . . . or any other order or process to enforce support obligations against an individual," to allow a court to consider a representative payee's receipt of a lump-sum benefit in computing child-support benefits. In *Silver v. Pinskey*, 2009 Pa. Super. 183, ¶ 17, 981 A.2d 284, for example, the court reversed an order that redirected a portion of an SSDI benefit from a representative payee to the disabled parent who had shared residential custody, finding that order violated 42 U.S.C. § 407. Nevertheless, the court determined that on remand 42 U.S.C. § 659 granted authority to make the SSDI funds accessible via a child-support order. The court allowed an upward departure from that state's child-support guidelines in a manner that would require the representative payee to pay child support to the disabled parent, who along with the nonobligor incurred expenses related to the "current maintenance" of the children while they were in his home under a shared residential custody arrangement. In *LaMothe*, 193 Vt. at 414, the Vermont Supreme Court reached the same result in another shared residential custody situation, stating:  "We do not purport to direct mother as representative payee to transfer the derivative benefit to father; rather, we consider the implications of the derivative payment on the parties' respective [child-support] obligations."

In both of these cases, the parents' shared residential custody justified sharing the monthly SSDI derivative benefits. Absent those circumstances, the court in *Brevard*, 74 N.C. App. at 488, determined that § 659 does not apply as an exception to § 407 with respect to derivative Social Security benefits. The *Brevard* court reasoned that the

benefits belong to the children and children are not individuals obligated to pay child support under state law. Therefore, the funds could not be redirected.

Nevertheless, other courts have recognized yet another option—requiring the lump-sum SSDI benefits to be used to relieve the obligor of support obligations that may exist in addition to the child support payments, such as the cost of health insurance or paying unreimbursed medical or dental expenses. In *LaMothe*, in addition to adjusting the monthly child support because of the shared-custody arrangement, the court allowed the SSDI accumulated benefit to be credited against orthodontic expenses the father had been previously ordered to pay. The court concluded:  "Unless the benefit is applied and credited toward [the disabled obligor's] child support obligations, including those relating to health expenses, [the nonobligor] will receive a windfall and [the obligor] will be forced to essentially make a double payment." 193 Vt. at 417.

6. *A Middle Ground*

As these cases illustrate, the equitable case for reimbursement or some form of credit has compelled many jurisdictions to turn away from a categorical rule denying any accommodation. As we weigh this against the "nothing" approach adopted by the Court of Appeals majority, we conclude a discretionary approach within the restrictions of federal law best furthers the policies behind our child support guidelines.

Child support is complicated. The financial assets of a party reflected by a spreadsheet's rigid numbers, devoid of context, are not the only thing that drives the calculation. District courts can consider practical reality. See Guidelines § IV.E.6. (2014 Kan. Ct. R. Annot. 145) ("The financial situation of the parties may be reason to deviate from the calculated Basic Parental Child Support Obligation if the deviation is in the best

interest of the child. . . . One example might be if either party has more than one job, the circumstances requiring the additional employment should be considered."). A lump-sum payment of SSDI benefits, the parties' good faith, and other equities can—and should—be among the factors a district court considers in modifying or creating a child-support order that both satisfies the child's best interests and is equitable to both parents.

Certainly, per se rules are more easily applicable than case-by-case determinations. But the Guidelines anticipate the need for discretion, when necessary. See Guidelines § I. (2014 Kan. Ct. R. Annot. 127) (district court can make adjustments to the child-support calculations if relevant evidence establishes "it is in the best interest of the child"). Further, § V.B.2. permits district courts to impose sanctions in some situations, such as the failure to disclose a material change of circumstances or the concealment of financial information. And those sanctions can be in the form of a credit, an increase in the child-support obligation, or "other sanctions." (2014 Kan. Ct. R. Annot. 148.) As a result, district courts are adept at considering the circumstances in each case and exercising discretion to fashion remedies that are in the best interests of children and also within the boundaries of law and equity.

We do not believe that a lump-sum SSDI payment should receive special treatment by being removed from the realm of judicial discretion. We hold, therefore, that a district court may—but does not necessarily have to—grant a credit to an obligor who is current on child support when a lump-sum SSDI accrued benefit duplicates the obligor's support payment. A credit, if granted, may be used to offset other support obligations imposed by the court on the obligor. Alternatively, the district court might adjust an obligor's support obligations, require reimbursement of the duplicative payments from funds that are discrete from SSDI benefits, or fashion some other equitable remedy permitted under applicable federal statutes and regulations.

31

Certainly, the federal statutes and regulations limit the discretion and the practical effect of any credit or adjustment. Nevertheless, as suggested by the North Dakota Supreme Court in *Davis*, 2010 ND 67, granting a credit does not by itself violate federal law. Rather, federal law may limit the types of remedies available to ensure an actual realization of the credit's benefits.

On the other hand, there may be real impact. For example, the SSDI benefit can be credited toward a shared expense, such as uninsured dental and medical expenses, the costs of lessons or activities, private-school tuition, childcare, or other costs the parties have agreed to share. See, *e.g.*, *LaMothe*, 193 Vt. at 412-13 (crediting lump sum towards a shared orthodontic expense). A credit towards other obligations for paying the expenses related to the child's current maintenance does not violate the restrictions on the use of SSDI moneys, nor would a modification of child support in an appropriate case, such as *Silver*, 2009 Pa. Super. 183, or *LaMothe*, 193 Vt. at 414.

In some unusual cases, it may even be equitable to require the nonobligor parent to reimburse an obligor parent, in full or in part, from funds that are discrete from SSDI benefits. See *Steel*, 209 W. Va. at 709-10 (denying reimbursement because 42 U.S.C. § 407[a] does not allow it and the equities of the case do not support reimbursement from other funds). In one such case, *Hamilton v. Reynolds*, 5 N.E.3d 1053, 1061 (Ohio App. 2013), equitable considerations drove the court to order a nonobligor to reimburse the obligor from other funds. The court noted that the obligor father had given notice of his disability claim and remained current with his support. Meanwhile, the nonobligor mother knew that she might have to reimburse him (the issue had arisen before). Yet in the few months after receiving $17,052 in accumulated benefits, the mother spent the entire accumulated SSDI payment and did not tell the court what she had purchased. Given those circumstances, the Ohio Supreme Court affirmed the district court's order

32

requiring the mother to repay the father for his overpayment of child support in monthly installments of $500. 5 N.E.3d at 1062-63.

These cases provide just a few examples of how a district court might exercise discretion when allowing a credit. We cannot predict all situations, and other circumstances may arise where a district court finds a solution that does not run afoul of the constraints imposed by federal law. In summary, it would be within the district court's discretion to allow the accommodation or to even enter an order allowing a credit to be applied in the future.

We recognize that allowing the district court this discretion does not eliminate disparate treatment of all obligors. In part, this is due to the *Taber* panel's decision to mandate a credit when an arrearage exists rather than to recognize discretion as we are today. But, as we have previously noted, the holdings in *Taber* and *Hohmann* are not at issue in this case. Nevertheless, through today's decision, at least all obligors who have paid their support will be able to argue for an equitable result.

The district court did not recognize this discretion. Therefore, we remand this case to the district court for determination of whether it is in the best interests of the children under the circumstances of this case for Papineau to receive a credit and perhaps some form of accommodation.

CONCLUSION

We reverse the Court of Appeals and the district court and remand to the district court for reconsideration of Papineau's motion to modify.

Reversed and remanded with directions.